UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MAYSOON AL-HAIDERI,

                        Plaintiff,

              -against-

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY
MEDICAL CENTER, COLUMBIA UNIVERSITY COLLEGE
OF PHYSICIANS AND SURGEONS,

                      Defendants.
------------------------------------------------------------X

Docket No.: CV-07-106
(LTS)(DCF)

## AMENDED COMPLAINT

## *JURY TRIAL DEMANDED*

Plaintiff, MAYSOON AL-HAIDERI, , by and through her attorneys THE LAW OFFICES OF FREDERICK K. BREWINGTON, as and for her Amended Complaint against Defendants, respectfully states and alleges, upon information and belief, as follows:

## INTRODUCTION

1.      Prior hereto, Plaintiff filed a Complaint on January 4, 2007.  This is an amendment of that Complaint which is done, pursuant to Order of this Court, *Al-Haideri v. The Trustees of Columbia University in the City of New York, et. al.*, 2007 WL 2187102 (S.D.N.Y. 2007).  This is a civil action, seeking injunctive relief, monetary relief, including past and ongoing economic loss, compensatory damages, punitive damages, disbursements, costs and fees brought under The Americans with Disabilities Act, 42 U.S.C. §12101 et. seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 (e) (as amended), Age Discrimination in Employment Act of 1967, 29 U.S.C. §623, et. seq. (as amended), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d)

2.      Specifically, the Plaintiff alleges that the Defendants, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY IN THE CITY OF NEW

YORK, COLUMBIA UNIVERSITY MEDICAL CENTER, COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS, together with their agents, servants and employees, acting both individually and in conspiracy with each other, acting beyond the scope of their job duties or functions, have intentionally, knowingly, purposefully, negligently, carelessly, and recklessly sought to and failed to properly supervise. Defendants and their agents further promulgated discriminatory policies, and directed and encouraged its agents to carry out such policies, which Defendants knew to be detrimental to Plaintiff, and did deprive Plaintiff of employment, position, title and pay through a pattern of discrimination, retaliation, misrepresentation, misinformation, harassment, and character assassination, while fostering an environment that allowed for Plaintiff to be harassed and discriminated against. Through such acts, Defendants further created a hostile workplace, with abuse and manipulation of laws rules and regulations, on the basis of Plaintiff's disability, national origin, and age.

3.      Said acts were done knowingly, with the consent and condonation of THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY MEDICAL CENTER, and COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS, with the intended and expressed purpose of punishing, silencing, isolating, removing and violating the rights of Plaintiff as protected by statutes, rules and regulations. Said activity was known to the Defendants, and was accepted and supported as policy, practice and custom.

## JURISDICTIONAL VENUE

4.      Jurisdiction of this court is invoked under 28 U.S.C. § §1331 and 1343 and 42 U.S.C. § 2000(e). This Court is requested to exercise pendant jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Prior to the filing of this action on October 6, 2004, within 300 days of the acts complained herein, and well within the 300 days of Plaintiff's last day of working in December

2

2003, Plaintiff properly filed a charge of discrimination against the Defendant COLLEGE OF PHYSICIANS AND SURGEONS AT COLUMBIA UNIVERSITY, with the New York State Division of Human Rights (NYSDHR No.10101882). Said charge was cross-filed with the United States Equal Employment Opportunity Commission (hereafter "EEOC") under charge no. 16G-A400058. That complaint alleged discrimination and retaliation based upon age, national origin and disability.

5.      The United States Equal Employment Opportunity Commission issued a Notice of Right to Sue letter to plaintiff in this action, in conformity with the applicable rules, dated October 6, 2006 and received by plaintiff on October 10, 2006 (Exhibit A)  This complaint is filed within 90 days of plaintiff's receipt of that Notice.

6.      Venue herein is proper under 28 U.S.C. § 1391(b); the cause of action arose in the Southern District of New York and upon information and belief all Defendants maintain offices in New York County and the Plaintiff resides in Nassau County.

## PARTIES

7.      Plaintiff, MAYSOON AL-HAIDERI, is, and was, at all times relevant herein, a natural person, 57 years old, having been born on October 18, 1949 in Baghdad, Iraq, into a Kurdish family. Plaintiff AL-HAIDERI presently resides in Glen Cove, County of Nassau, State of New York, and at all relevant times was an employee of THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK , COLUMBIA UNIVERSITY MEDICAL COLLEGE, COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS.

8.      The Defendant COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK (hereinafter "UNIVERSITY") incorporated as THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK  (hereinafter "TRUSTEES") is a duly organized institution of higher

3

learning and includes three undergraduate schools, thirteen graduate and professional schools, and a school of continuing education. The University is  governed by the laws of the State of New York and the United States. The University at all relevant times was the employer of Plaintiff. (any references to the Defendants Trustees in this Complaint are intended to include the Columbia University of the City of New York as well and vice versa).  Upon information and belief, the University is a recipient of Federal funds for both educational and staffing needs.

9.      The Defendant COLUMBIA UNIVERSITY MEDICAL CENTER (hereinafter "MEDICAL CENTER") is located in the Washington Heights community of northern Manhattan and is a part of the Columbia University system. Faculty members from its four schools (College of Physicians & Surgeons, College of Dental Medicine, School of Nursing, and Mailman School of Public Health) carry out the school's core mission of educating and training future generations of health care professionals; conduct basic research with the ultimate goal of translating discoveries into new techniques for fighting disease and improving health; are responsible for a number of significant clinical breakthroughs.

10.     The Defendant COLUMBIA UNIVERSITY COLLEGE OF PHYSICIANS AND SURGEONS (hereinafter "COLLEGE"), is located at 630 W 168th Street, AND is one of four schools of the MEDICAL CENTER.

11.     During all times mentioned in this complaint, the Defendants and each of them, separately and in concert, engaged in acts and omissions which constituted deprivation of the statutory rights, guarantees and immunities of the plaintiff, and while these acts were carried out, they had no justification or excuse in law, and were instead gratuitous, illegal, improper and unrelated to any activity in which employers may appropriately and legally engage in the course of protecting persons and property or ensuring civil order.

4

12.     Each of the Defendants at all times relevant to this action had the power and the duty to restrain the other Defendants and prevent them from violating the law and the rights of the Plaintiff; but each of the Defendants failed and refused to perform that duty, failed and refused to restrain the other Defendants, and thereby became a party to the injuries inflicted upon the plaintiff, and acted in concert with the others to harm plaintiff.

## FACTUAL ALLEGATIONS

13.     The Plaintiff was born into a Kurdish family in Baghdad, Iraq, on October 18, 1949.

14.     Plaintiff has a disability in that she suffers from Complex Regional Pain Syndrome/Disorder, also known as "Causalgia," which is an impairment defined as a disability. Plaintiff was diagnosed with this disability in October of 2001.

15.     Because of Plaintiff's age, (over 50 years old), her national origin and her disability, she has been subjected to a repeated, continuous and ongoing practice of unlawful discriminatory conduct and discriminatory actions by the Defendants, while under their employ. Said practice includes but is not limited to an ongoing and continuous practice of refusing to promote Plaintiff, and other such discriminatory actions by Defendants throughout Plaintiff's employment, as set forth in the within factual allegations.

16.     Due to her disability, and the institutional Defendants refusal to accommodate same, on December 11, 2003, Plaintiff stopped working. Although currently not working, Plaintiff remains employed – without salary – by the institutional Defendants.

**Plaintiff's Initial Hiring:**

17.     In the Spring of 1991, Defendants, through their agents, extended an offer of employment to Plaintiff, to work as a medical trainee in their Department of Pediatrics.

18.     Plaintiff started working for the Defendant UNIVERSITY at the Defendant's MEDICAL

CENTER COLLEGE's Department of Pediatrics as a Postdoctoral trainee, beginning on May 6, 1991.

19.     The Defendants' offer of employment (through its written "Employee Handbook," Guides and Employee Manuals) contained specific assurances as to the terms of Plaintiff's employment –i.e., a specific promise not to terminate or harass Plaintiff, or deny Plaintiff opportunities for advancement or compensation, based on her national origin, age, disability, or in retaliation for opposing discrimination, and to abide by federal laws requiring such equal terms and conditions of employment as afforded to non-protected class employees.

20.     Defendants, through its agents, made Plaintiff aware of the aforesaid policy provisions, when she was considering employment with said Defendants.

21.     In making her decision to accept and continue her employment with the Defendants, Plaintiff detrimentally relied upon Defendants' written policies and oral assurances (that she would not be denied advancement, compensation, or equal terms and conditions of employment, and would not be mistreated or harassed based upon her national origin, age, disability, or other protected class status).

22.     Notwithstanding the Defendants' specific promises and anti-discrimination clause of its Employee Handbook, Defendants, through their agents and through the actions of Dr. Deckelbaum, Dr. Discoll and Ms. Hanson, condoned and contributed to the mistreatment, discrimination, denied advancement, and unequal promotion of Plaintiff, based upon her national origin (Iraqi), her age, and her disability.

## Plaintiff's Employment With The Defendants:

23.     The discriminatory treatment to which the Plaintiff was subjected, including Defendants' discriminatory practice and policy of repeatedly refusing and failing to promote Plaintiff, began from the time of her employment in 1991 and remains continuous and ongoing. Supervisor(s), Drs. Deckelbaum and Discoll repeatedly denied said promotions to Plaintiff, and the Defendants continued

6

to condone such behavior.

24.    Prior to her employment with the Defendant UNIVERSITY, Plaintiff received a Doctor in philosophy in 1987, a Masters of Arts in philosophy in 1985, and a Masters of Arts in 1983 all from Columbia University. Plaintiff also received an Advanced Diploma in Clinical Analysis in 1979 from Baghdad University and Bachelor of Science in 1973 from Bagdad University, College of Pharmacy.

25.    Plaintiff served as a Postdoctoral Fellow with the North Shore University Hospital, Manhasset, New York from 1987 - 1988; as a Research Scientist with the Long Island Jewish Medical Center from 1988-1990; as an Instructor with the Albert Einstein College of Medicine, Bronx, New York from 1989-1990.

26.    Prior to her work experience in research in the United States, Plaintiff served as a Trainee in Clinical Biochemistry, Hematology, Bacteriology, Parasitology, Infectious Diseases and Blood Bank with the Ministry of Health, Baghdad, Iraq from 1974-1975; as Director of Clinical Laboratory at the Abo-Alkhaseab Hospital, Basrah, Iraq, from 1975 - 1976; as Chief, Division of Biochemistry, and Supervisor of Students at the Al-Khadmia Hospital, Baghdad, Iraq, from 1976 - 1978; as the Chief, Division of Hematology, Director of Blood Bank and Supervisor of Students at the Al-Khadmia Hospital, Baghdad, Iraq, from 1979 - 1981; as Director of Quality Control and Standardization of Clinical Analysis, for all public Clinical Laboratories of Iraq, on a nation-wide scale a the ministry of Health, Baghdad, Central Pathology Institute, from 1981-1982; and as a Trainee in Infertility, at the Ministry of Health, Baghdad, Iraq, in 1982.

27.    As the beginning of what would become a regular practice of disparate and unequal treatment of Plaintiff, Defendants hired Plaintiff into a trainee position – a position which was clearly below her skills, capabilities, education and work experience – at a low pay scale.

28.    Despite Plaintiff's reservations in taking a position that did not match her skills and

7

experience level, Plaintiff took the position with the expectation that she would rapidly advance to an appropriate position, consistent with her education and work experience.

29.    From 1991 through 1994, despite Plaintiff's repeated, expressed requests for advancement, Defendants engaged in a practice of treating Plaintiff with lesser opportunities for advancement than her non-Iraqi and/or younger colleagues. Specifically, Defendants refused to advance Plaintiff or otherwise move her from the position of Postdoctoral trainee for approximately three years – while younger and/or non-Iraqi employees received advancement and movement during such time.

30.    In furtherance of Defendants' discriminatory policy – that of affording Plaintiff lesser compensation and limited opportunities for advancement – the Defendants kept Plaintiff in the same position of trainee from 1991 through 1994, where Plaintiff: (a) did not receive any benefits, and (b) was not allowed to be a faculty or staff member of the Defendant College.    Defendants implemented said discriminatory policy by refusing to promote Plaintiff, based on their ageism and their animus towards her Iraqi origin.

31.    In comparison, on information and belief, at the time that Toru Seo, Asian, male and younger than Plaintiff, began working in the Department of Pediatrics, as a trainee. However, Dr. Deckelbaum placed Toru Seo in the Nutrition Division and clearly placed him on a promotional track, with far more opportunities than those afforded to Plaintiff by Dr. Deckelbaum .

32.    Upon information and belief, Dr. Seo was promoted, not to Research Scientist (as would be customary), but to the higher position of Assistant Professor, with corresponding pay increases. Plaintiff was not so promoted.

33.    Based on her meritorious performance during her traineeship, on or about May 6, 1994, Defendants offered the Plaintiff a faculty position as an "Associate Research Scientist" in the Gastroenterology and Nutrition Division of the Department of Pediatrics, in the Defendant College of

8

Physicians and Surgeons. Plaintiff accepted the position. However, Defendants, specifically Defendant supervisor Dr. Deckelbaum, continued their policy and practice of subjecting Maysoon Al-Haideri to disparate treatment (through lesser opportunities for advancement), by relegating Plaintiff to the same duties, responsibilities, and services in this faculty position that Plaintiff had under the trainee position she had been holding for three years prior.

34.     Thereafter, for approximately 12 years, from 1991 to 2003 the date of Plaintiff Al-Haideri's departure on disability leave, Plaintiff performed the work of an Associate Research Scientist without ever being promoted, despite continuously and repeatedly seeking such promotions from Dr. Deckelbaum and from the institutional Defendants.

35.     Plaintiff was qualified to perform the position and her attendance and performance were excellent. In fact, Plaintiff's immediate supervisor, Dr. Deckelbaum, told her on a number of occasions that he held a very high opinion of her work. On information and belief, Dr. Deckelbaum communicated his evaluation of Plaintiff's performance to Dr. Driscoll, the Chair of the Department of Pediatrics of the Defendant College of Physicians and Surgeons. Repeatedly, Dr. Dr. Deckelbaum would introduce Plaintiff to visitors stating " She is the first one to open the door in the morning and the last one to close the door at night," referring to the long hours that Plaintiff put in at work.

36.     From 1994 through 1999, the Defendants, including Dr. Deckelbaum, took actions which further served their discriminatory policy of intentionally limiting Plaintiff's career advancement opportunities, based on her Iraqi national origin and her age. Specifically, in furtherance of said discriminatory practice, Defendants repeatedly refused Dr. Al-Haideri's numerous requests for promotion, advancement, and salary increases. Plaintiff made said requests for promotion repeatedly and on a continuing basis, to Dr. Deckelbaum throughout 1994, 1995, 1996, 1997, 1998, and 1999. However, without justification, Defendants continually denied Plaintiff said requests for promotion,

9

while the institutional Defendants took no action to prevent or remedy said discriminatory treatment of Plaintiff.

37.    Defendants' repeated denial of Plaintiff's request for a promotion were related rejections, as they each served the same discriminatory policy of providing Plaintiff with lesser salary, less compensation, less opportunities and less prestige than her non-Iraqi and/or younger colleagues/employees of the Defendant.

38.    Upon information and belief, Plaintiff's similarly situated colleagues received advancement, higher positions, more responsibilities and more money from the Defendants, based on their national origin and younger age.

39.    On March 13, 2000, after Plaintiff Al-Haideri repeatedly sought and was refused a promotion, Dr. Dr. Deckelbaum formally recommended that Plaintiff be promoted to the position of "Research Scientist." In a letter to Dr. Driscoll, Dr. Deckelbaum stated, "Her [Plaintiff's] research and academic accomplishments have grown increasingly over the past several years."

40.    After starting Plaintiff out at a low salary as a faculty member in 1994, Dr. Deckelbaum recommended Plaintiff Al-Haideri for a promotion, while simultaneously not recommending a corresponding salary increase for Plaintiff.  Upon information and belief, Dr. Deckelbaum had customarily recommended such corresponding salary increases to Plaintiff's peers, faculty members and other, similarly situated persons who were promoted by Dr. Deckelbaum.

41.    Upon information and belief, Defendants' hiring of Plaintiff in a lower, under-employed position in 1991, followed by Dr. Deckelbaum's refusal to promote Plaintiff until 1994, with a subsequent *six year* refusal to promote Plaintiff again until a year 2000 promotion, *without* the customary salary increase, were acts performed by Defendants and by Dr. Deckelbaum. Said acts were performed under Dr. Deckelbaum's long-existing discriminatory practice and policy, of limiting

10

Plaintiff's compensation and chances for growth and development in her employment, based upon Dr. Deckelbaum's animus towards Plaintiff's Iraqi national origin and her age.

42.    On information and belief, Dr. Driscoll and Dr. Deckelbaum each acted outside the scope of his job duties, by participating in the above stated, unlawful and discriminatory practice and policy of Dr. Dr. Deckelbaum towards Plaintiff – a policy that was condoned and unremedied by the remaining Defendants, throughout Plaintiff's employment.

43.    Specifically, Dr. Driscoll responded to Dr. Deckelbaum's recommendation letter, stating that since the recommended promotion is equivalent to the rank of Associate Professor, Plaintiff would need to publish one more publication regarding a research project. Dr. Deckelbaum informed the Plaintiff of this "condition," which was now made a requirement to her being promoted.

44.    Thereafter, in February 2001, in response to Dr. Driscoll's statements to Dr. Deckelbaum as communicated to the Plaintiff, a manuscript co-authored by Ms. Al-Haideri, wherein she was the lead author, was published in the Journal of Cellular Biochemistry, 81: 114-127.

45.    Having now met the Defendants' condition that she publish a second article in order to be promoted, Defendants nonetheless failed to promote Plaintiff to the position of Research Scientist, as promised by Drs. Deckelbaum and Discoll. Upon information and belief, Dr. Driscoll and Dr. Deckelbaum never intended to promote Plaintiff upon her publication of another research project, and tacitly agreed with one another to establish this "condition" to promotion.

46.    To date, the Defendants have not promoted the Plaintiff to the position of Research Scientist, despite six additional manuscripts having been published by the Plaintiff in 2001, 2002, and completed in 2003.

47.    Plaintiff has never been advised, in writing or otherwise, that her name needed to be listed as the first author on a publication in order to receive scholarly credit.

11

48.    Contrary to other similarly situated persons, Plaintiff was prohibited from achieving scholarly recognition in that she was frequently and consistently prohibited by Defendants from participating in projects that would provide her with opportunities to obtain scholarly recognition.

49.    Dr. Deckelbaum routinely assigned Plaintiff to work with her peers rather than being assigned her own projects. Such lab assignments served to prohibit Plaintiff from achieving scholarly recognition through publications of articles that discussed her own research projects. Upon information and belief, Dr. Deckelbaum's singling Plaintiff out from her similarly situated, non-Iraqi and/or younger colleagues to routinely work on group projects that took her away from her own career advancement, was part of the same discriminatory policy and practice that Dr. Deckelbaum had inflicted upon Plaintiff continuously, since her 1991 hire under his supervision. Said policy included denied pay increases, denied promotions and denied advancement in duties and functions, and said discriminatory policy by Defendants continued from 2000 through 2004.

50.    On information and belief, assignment to perform clinical research on a specific project provided more opportunities for publication.

51.    Upon information and belief, Dr. Deckelbaum who was in charge of the lab, was also in charge of assigning Plaintiff to research various projects. Dr. Deckelbaum would instead assign Plaintiff to assist her peers on their projects or assign Plaintiff to perform a component of a project for someone else or otherwise assign Plaintiff to help the laboratory staffs including graduate students.

52.    As a result Plaintiff's name would often be listed on a publication not a as a lead author but as a second, third, fourth, fifth or sixth author on the publication. In some instances where Plaintiff performed highly pertinent research work, her name would not even be listed as an author but would merely be mentioned with thanks.

53.    Plaintiff was often called upon to render major research services to her peers and co-

12

workers that often did not involve her own research such as the adaptation of the Electron Microscopic methods to the needs of others. Additionally, Plaintiff was often assigned by Dr. Deckelbaum to carry out extensive research activities not directly related to her own research, stemming from the laboratory's collaboration with researchers in other Columbia Departments, other American institutions and foreign research organizations.

54.    As an example, Plaintiff worked very hard to establish a procedure for the use of electron microscopy (EM) and thereafter was assigned to perform all experiments that were related to EM. In 1992, a paper was published from the lab which utilized pictures produced as a result of the procedure established by the Plaintiff using EM. Upon information and belief, the paper was initially rejected and later accepted after inclusion of photographs produced by the Plaintiff using EM. Despite the fact that Plaintiff's experiments and research were included in the paper, she was not given any credit for having performed her experiments, experiments without which, on information and belief, the paper would not have been accepted for publication. Plaintiff's name was only mentioned as an acknowledgment at the end thereof.

55.    Additionally, at the time that the Plaintiff performed her research on EM, she was in need, but was not provided with any technicians to assist her. This failure was despite Defendants, specifically Dr. Deckelbaum's knowledge of her disabilities and medical issues. Defendants knew in detail of Plaintiff's several surgeries she had performed, known her disabilities and still she did not receive any help from anyone in the group whose names were published on the paper. In fact, at the time that Dr. Deckelbaum hired Plaintiff as a Postdoctoral trainee in 1991, he knew of her medical issues because her recommendation for the position stated that, despite her medical issues, she was a very hard worker.

56.    Plaintiff provided instructional, supervisory, scholarly and administrative services while

13

serving in the capacity of Associate Research Scientist. Plaintiff also trained professionals, post-doctoral students and technicians some of whom received promotions over Plaintiff.

57.    After September 11, 2001, when the World Trade Center was attacked by terrorists, some of whom were Muslim, Plaintiff noticed that many of her coworkers were less friendly, and some started making offensive comments and jokes about Islam.

58.    Plaintiff told her co-workers that she did not appreciate the comments and jokes, but they continued to make such painful and discriminatory jokes and comments.

59.    In fact, when Plaintiff complained to Dr. Deckelbaum, he did not take any steps to stop the discriminatory jokes and comments. Plaintiff told Dr. Deckelbaum that she was being harassed and bothered by her co-workers, and she told Dr. Deckelbaum about the jokes and comments that were being directed to her, concerning Islam.

60.    Rather than address the co-workers who were harassing Plaintiff based on her national origin and based on her perceived national origin, Dr. Deckelbaum instead responded by stressing to faculty, students and staff, that Plaintiff's ethnicity was Kurdish. Defendants took no other steps to address the discriminatory treatment to which Plaintiff was being subjected

61.    Thereafter, Plaintiff noticed that she was excluded from meetings where discussions of papers and scientific projects were being discussed after that date. Plaintiff was only advised about lab meetings which were routine meetings. If Dr. Deckelbaum wanted to meet with the Plaintiff, she would not be told. In another instance, and before September 2001, Plaintiff was excluded from a rehearsal meeting, regarding Ms. Y.Y. Ho's thesis. As a consequence of not being informed about meetings, Plaintiff did not attend, and that caused her supervisors to believe that she was not interested in doing what was required of her in the performance of her duties.

62.    Upon information and belief, after September 11, 2001, the Defendants stressed her ethnic

14

origin as being Kurdish, so as to defray any concerns held by Plaintiff's co-workers that she was a Muslim Arab. From September 11, 2001 until Plaintiff left on disability leave in December 2003, Plaintiff was told by Dr. Deckelbaum that she should let other people know she was "Kurdish."

63.    On October 1, 2001, Plaintiff underwent a interventional-radiological procedure related to an existing medical condition. Within several hours she began to experience neurological symptoms in her left upper extremity. Her condition was subsequently diagnosed as Complex Regional Pain Syndrome which is disabling and permanent, with persistent severe pain. Plaintiff Al-Haideri's disability denied her the full use of her left arm.

64.    Upon her return to work in October 2001, Plaintiff Al-Haideri immediately informed Dr. Deckelbaum in person that she was disabled, in that she had lost the full use of her left arm as a result of the surgery. Plaintiff immediately requested an accommodation for said disability, by way of the assistance of a technician, to assist her in performing her research work.

65.    Plaintiff's request for a technician to assist her was reasonable, in that the Defendants had, as a custom, offered the assistance of a technician to similarly situated employees, whether they were physically injured, pregnant, or otherwise in need.

66.    On information and belief, prior to Plaintiff's request for a technician to assist her in the performance of her duties, Defendants granted a similar request made by a younger, German employee, who became pregnant and was assigned a technician, to help her with her work during her pregnancy.

67.    Additionally, subsequent to Plaintiff's request for an accommodation, a Japanese male, Dr.. Seo, who was not disabled, was granted the assistance of a technician to help him before he received a grant to allegedly "pay the technician".

68.    Nevertheless, when Plaintiff returned to work from her surgery in October 2001, Dr. Deckelbaum, who knew that Plaintiff was rendered physically disabled from the surgery and was very

15

familiar with Plaintiff's medical issues, refused to grant Plaintiff's request that someone assist her, as an accommodation to help her in the performance of her duties, as a qualified yet disabled employee.

69.    From 2001 through Plaintiff's disability leave in December of 2003, and continuing, in March of 2004, Plaintiff made repeated, expressed requests to the Defendants for a reasonable accommodation of her disability; to wit, a technical assistant, graduate student or staff member to assist her.

70.    However, as part of the Defendants' longstanding and ongoing practice of discriminating against Plaintiff, Defendants, and Dr. Deckelbaum, engaged in a practice of denying Plaintiff's requests for disability-based accommodations – without any reason other than Dr. Deckelbaum's animus for Plaintiff, based on her disability, national origin and age.

71.    Defendants' repeated denial of Plaintiff's request for a disability- accommodation were related rejections, as they each served the same discriminatory policy of the Defendants; to wit, a practice of providing Plaintiff with more obstacles in performing her job, and further served to slow down Plaintiff's progress at the UNIVERSITY.

72.    Upon information and belief, the institutional Defendants, knew of Dr. Deckelbaum's policy of disability-based discrimination and national origin and age-based discrimination against Plaintiff, yet the institutional Defendants continuously failed to remedy said known rejections of reasonable accommodation requests, throughout 2001, 2002, and 2003. Said institutional Defendants, further permitted the aforesaid, ongoing policy of disability-based discrimination against the Plaintiff to go unremedied, throughout her disability leave.

73.    Dr. Deckelbaum failed to provide the Plaintiff with even a graduate student or other staff member to assist her in the performance of her duties so as to accommodate her disability. Instead, Dr. Deckelbaum refused her request for an accommodation and informed the Plaintiff that she needed to

apply for a grant to pay for a technician. Upon information and belief, at no time did Dr. Deckelbaum speak with Human Resources or Labor Relations, to obtain the assistance of a technician so as to accommodate Dr. Al-Haideri's disability.

74.    Dr. Deckelbaum repeatedly told the Plaintiff, in response to her many pleas for an accommodation, that she could get a technician if she applied for and received a grant. Dr. Deckelbaum did not make such a requirement for at least two of Plaintiff's peers, who received the assistance of a technician.

75.    On information and belief, besides the two faculty members mentioned above, many Chinese and American students received the assistance of technicians to help them without applying for any grants.

76.    As a result of not being provided with any accommodation for her disability, Plaintiff's health worsened, and she was forced to leave on December 11, 2003 because of her disability.

77.    In 2002, after few months after Plaintiff became disabled, Plaintiff did not receive the customary cost of living increase as she had in previous years while upon information and belief, her co-workers did.

78.    In August 2002, Plaintiff asked Dr. Deckelbaum for the customary cost of living increase. Dr. Deckelbaum told the Plaintiff to go to the Administrator of the Gastroentrology Division and ask him to process the paper for the increase and promised she would receive the raise.

79.    Thereafter, Plaintiff followed up each month, in person, with the Administrator and was told there is no problem, and that it takes time to process the paperwork, to effectuate the increase. After a few months, Plaintiff was informed by the Administrator that Dr. Deckelbaum told him to put the processing of the papers on hold and that Plaintiff should speak with Dr. Deckelbaum regarding the hold on processing the papers to receive her raise.

17

80.     Plaintiff thereafter spoke with Dr. Deckelbaum, who advised her that the Defendants did not have the money; yet upon information and belief, Plaintiff's co-workers within Dr. Deckelbaum's Department received such raises.

81.     In December 2002, Plaintiff learned from Dr. Trim, the new Chief of the Division of Pediatrics, Gastroenterology, that Dr. Seo, Asian male who is approximately 36 years old, and upon information and belief is not disabled, was being considered for a promotion. Dr. Trim advised Ms. Al-Haideri that Dr. Deckelbaum had asked Dr. Trim to write a letter of recommendation to promote Mr. Seo. During that conversation, Dr. Trim asked the Plaintiff to tell Dr. Seo that he wanted to meet with him before writing the letter of recommendation, *as he did not know Mr. Seo.*

82.     Plaintiff was shocked and amazed that Dr. Seo, who has spent less time in the Department, was being considered for a promotion while her promotion had been pending for two years.

83.     Plaintiff was further dismayed to learn that Dr. Trim, the new Chief of the Department was writing a recommendation for someone he did not know and with whose work he was not familiar.

84.     Plaintiff, who had been in the Department for 12 years, was emotionally outraged and upset to learn of Dr. Seo's promotion on the very day she was leaving on disability leave while her promotion continued to lag.

85.     On information and belief, Dr. Seo was duly promoted a short time thereafter as his name was listed in the Columbia University directory as "Assistant Professor."

86.     Throughout 2000, 2001, 2002, 2003 and 2004, Dr. Deckelbaum's refusal to provide Plaintiff with raises was part and parcel to the Defendants' ongoing discriminatory policy of preventing Plaintiff from advancing and/or receiving increased compensation, due to her national origin, age and disability.

87.     In 2003, Plaintiff again sought a wage increase from Dr. Deckelbaum and was told again

18

that he did not have the money to give her a raise, yet upon information and belief, Plaintiff's peers received such increases.

88.    Upon information and belief, Inga Hansen served in the capacity as manager of the lab on the authority of Dr. Deckelbaum. The lab was set up so that she was the only person who was in charge of ordering supplies as the program for ordering supplies was available only on her computer, at that time. Further she is the only one who knew which account to charge the orders. If the Plaintiff or her co-workers needed something they would all inform Ms. Hansen to order the item needed.

89.    Upon information and belief, Ms. Hansen was also the person who was in charge of the radioactive material and had the authority to assign the technician, Jenan Mosa to assist others. Ms. Hansen also held herself out as being in charge of the lab and Plaintiff and her co-workers were told by the Defendants that Ms. Hansen possessed the authority to order supplies.

90.    Further, from the time that Plaintiff was diagnosed as being disabled and so informed the Defendants, Plaintiff requested she be provided with a stapler that was easier to manipulate in light of her disability resulting in the limited use of her left arm. Plaintiff made her request known to Ms. Hansen, the Senior Research Worker, who was in charge of managing the lab on behalf of the Dr. Deckelbaum.

91.    Ms. Hansen, refused to provide Dr. Al-Haideri with such a stapler which was easier to operate given the disability she had with her left arm. Ms. Hansen told the Plaintiff that she could use the stapler in Ms. Hansen's office which forced the Plaintiff to stop her work and walk three rooms to use the stapler. This created a hardship for the Plaintiff, as in addition to the limited use of her left arm, Dr. Al-Haideri has had numerous knee surgeries, which made walking very difficult for her. These facts were known to the Dr. Deckelbaum and Ms. Hansen. The Defendants were fully aware of Plaintiff's other medical conditions and her disability.

92.    Many times when Plaintiff walked to Ms. Hansen's desk for the purposes of obtaining

19

the stapler, Ms. Hansen would say that she was using the stapler, thus forcing Plaintiff to walk back to her desk to wait until the stapler was available. Plaintiff Al-Haideri would then be forced to again walk back to Ms. Hansen's office to obtain it and then walk back to her work station use the stapler and of course walk back to return the stapler to Ms. Hansen.

93.    Plaintiff was denied a more easily operable stapler until the last day of work in December 2003.

94.    Additionally, Ms. Hansen, often callously disregarding the fact that Plaintiff could not use her left arm. Ms. Hansen would often order the lab technician to ask the Plaintiff to help lift 20 liter containers of radioactive waste material. Performing such tasks often placed the Plaintiff and others at risk of injury, as she lacked the ability to use her left hand due to the difficulties resulting from her disability, and thus increased the risks that she could spill radioactive material on herself and others. Plaintiff complained – to no avail – to both Ms. Hansen and Dr. Deckelbaum.

95.    On several occasions, from the date she informed Dr. Deckelbaum of her disability, Plaintiff verbally complained to Dr. Deckelbaum about the treatment to which she was being subjected to by Ms. Hansen. Dr. Deckelbaum responded to Plaintiff that he would speak with Ms. Hansen but upon information and belief he never did as her conduct continued.

96.    After Plaintiff left on disability leave starting December 11, 2003, Plaintiff was denied her vacation pay, despite her eligibility to receive such pay and several requests therefor both verbally and in writing. Although Plaintiff is currently not working, Plaintiff remains employed – without salary – by the institutional Defendants.

97.    Dr. Deckelbaum told Plaintiff in March 2004 that he would "think" about paying Plaintiff for her earned vacation time. After many calls, email messages and personal messages left by the Plaintiff with his secretary, he told Plaintiff Al-Haideri that he needed to discuss completed manuscripts that she

20

had written prior to her disability leave, with her before discussing her request for vacation pay. Plaintiff advised him that payment of her vacation, to which she was entitled, had nothing to do with papers. Defendants refused to pay the Plaintiff for her earned vacation time and continues to do so to date.

98.    In March of 2004, after Plaintiff stopped working due to her disability and due to the Defendants' failures to accommodate same, she requested in writing from Dr. Deckelbaum, that she be paid for her vacation July 1, 2002, through June November 30, 2003.  Plaintiff was advised by the Administrator of the Department of Pediatrics Ms. Janet Durieux, that she was owed 33 days vacation days and that she was waiting on Dr. Deckelbaum as to which grant to use to pay the Plaintiff for her earned vacation days.

99.    According to the faculty Hand Book " vacation time may not be accumulated beyond June 30 of the year following the one in which it was earned..."   Upon information and belief, no other employee has been denied vacation payment by the Defendants.

100.    While faculty and staff in Plaintiff's department were from various national origins the Defendants did not treat Plaintiff and other Iraqis the same. In fact, Jenan Mosa who was from Iraq was terminated from her job at the beginning of 2004. Fannie Keyserman, was an older employee who was terminated as well on information and belief due to her age.

101.    On or about March 25, 2004, Plaintiff wrote to the Defendants' Ombudsman Officer, describing the discriminatory treatment to which she was being subjected and seeking a resolution.

102.    On April 15, 2004, Plaintiff received an email from the Defendants informing her that the concerns she raised in her letter were beyond the scope of their area of responsibility, choosing to ignore the very important issues raised - failure to promote, age and disability discrimination - and failed to take any steps whatsoever to address them.

103.    Plaintiff was injured in her person, mental health, concept of self worth, business property,

21

professional future and otherwise, by reason of these overt violations/ actions set out above in that, as a direct and proximate result of all the wrongful acts of Defendants, plaintiff has had her constitutional and statutory rights violated; has lost benefits, has lost career status and advancement; has been subjected to humiliation, abuse, embarrassment and extreme physical and mental harm; and other injuries not yet fully ascertained.

104.    Defendants collectively and through their agents, servants and employees intentionally deprived Plaintiff of her constitutionally protected rights and did so because and on account of Plaintiff's disability.

## AS AND FOR A FIRST COUNT:
### 42 U.S.C. § 12101(e) - Americans with Disabilities Act

105.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 104 of this Amended Complaint with the same force and effect as though fully set forth herein.

106.    Plaintiff Maysoon Al-Haideri was/is an individual with a substantial life impairment (loss of function in her left arm, and Causalgia) – a disability as defined under and protected by the Americans with Disabilities Act.

107.    Since Plaintiff's disability leave in December of 2003, and continuing,  Plaintiff made repeated, express requests to the Defendants, seeking a reasonable accommodation of her disability; to wit, a technical assistant, graduate student or staff member to assist her, due to her inability to have full use of her left arm.

108.    However, as part of the Defendants' longstanding/continuous practice of discriminating against Plaintiff, the Defendants, engaged in an ongoing practice of repeatedly denying Plaintiff's requests for disability-based accommodations – without any reason other than Defendants' animus for Plaintiff,

based on her disability, national origin and age.

109.    Defendants' repeated denial of Plaintiff's request for an accommodation were related rejections, as they each served the same discriminatory policy of the Defendants.

110.    Upon information and belief, the institutional Defendants, engaged in a policy of disability-based discrimination, yet the institutional Defendants continuously failed to remedy said known rejections of reasonable accommodation requests from December 11, 2003 and thereafter.

111.    The above discriminatory practices based on Plaintiff's disability, by he institutional Defendants, its agents and employees violates the Americans with Disabilities Act, 42 U.S.C. §12101(e).

112.    As a direct result of said acts Plaintiff has suffered and continues to suffer loss of income, injury to her career, loss of other employment and retirement benefits, and has suffered and continues to suffer distress, damage to her physical and mental health, humiliation, embarrassment, great financial expense and severe damage to her reputation.

113.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive. They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff and without concern for the damage they would cause. Defendants' acts were motivated by a desire to not accommodate Plaintiff's medical needs without regard for Plaintiff's well-being, and were based on a lack of concern and ill will towards plaintiff.

114.    As per the decision of the Honorable Laura T. Swain, *Al-Haideri v. The Trustees of Columbia University in the City of New York, et. al.*, 2007 WL 2187102 (S.D.N.Y. 2007), Plaintiff respectfully claims all acts which occurred on or after December 11, 2003 as being actionable under this Cause of Action.

115.    As a result of Defendants' acts, Plaintiff suffered and is entitled to damages sustained to date and continuing, including compensatory damages, costs, attorneys' fees, additional monetary

losses, in the amount of five million ($5,000,000.00) dollars, and punitive damages in an amount to be determined at trial.

## AS AND FOR A SECOND COUNT
### Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e

116.    Plaintiff repeats and reiterates the allegations set forth in paragraph 1 through 115 inclusive of this Amended Complaint, with the same force and effect as though herein fully set forth herein.

117.    The institutional Defendants through its agents and employees, discriminated against the Plaintiff in her employment based on Plaintiff's age and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), as amended.

118.    The discriminatory acts and conduct of the aforesaid Defendants, including but not limited to Defendants' repeated failure to promote Plaintiff, repeated failure to provide equal compensation, condoning harassment, and subjecting Plaintiff to unequal terms and conditions of employment, as alleged above, were acts committed by the Defendants, as part of a single discriminatory policy and practice, which began in December 2003, and continues.

119.    The institutional Defendants, took actions which further served their discriminatory policy of intentionally limiting Plaintiff's career advancement opportunities, based on her Iraqi national origin and her age. Specifically, in furtherance of said discriminatory practice, Defendants repeatedly refused Plaintiff Dr. Al-Haideri's numerous requests for promotion, advancement and salary increases.

120.    Plaintiff made said requests for promotion repeatedly, and on a continuous basis, and further sought salary increases and advancement/promotion until she was required to stop working due to her disability. However, without justification, Defendants continually denied Plaintiff said requests for promotion, while the institutional Defendants took no action to prevent or remedy said discriminatory

24

treatment of Plaintiff.

121.    Defendants' repeated denial of Plaintiff's request for a promotion were related rejections, as they each served the same discriminatory policy of providing Plaintiff with lesser salary, less compensation, less opportunities and less prestige than her non-Iraqi and/or younger colleagues/employees of the institutional Defendants.

122.    Upon information and belief, Plaintiff's similarly situated colleagues received advancement, higher positions, more responsibilities and more money from the Defendants, based on their national origin and younger age.

123.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of income, loss of other employment benefits and has suffered and continues to suffer distress, humiliation, embarrassment, great financial expense and damage to her reputation.

124.    Defendants violated public policy in discriminating against Plaintiff because of her age and national origin.

125.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive. They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff and without concern for the damage they would cause. Defendants' acts were motivated by a desire to not accommodate Plaintiff's medical needs without regard for Plaintiff's well-being, and were based on a lack of concern and ill will towards Plaintiff.

126.    As per the decision of the Honorable Laura T. Swain, *Al-Haideri v. The Trustees of Columbia University in the City of New York, et. al.*, 2007 WL 2187102 (S.D.N.Y. 2007), Plaintiff respectfully claims all acts which occurred on or after December 11, 2003 as being actionable under this Cause of Action.

127.    As a result of Defendants' acts, Plaintiff suffered and is entitled to damages sustained

to date and continuing, including compensatory damages, costs, attorneys' fees, additional monetary losses, in the amount of five million ($5,000,000.00) dollars, and punitive damages in an amount to be determined at trial.

## AS AND FOR A THIRD COUNT
### Age Discrimination in Employment Act of 1967,
### 29 U.S.C. § 623 *et seq.* (as Amended)

128.    Plaintiff repeats and reiterates the allegations set forth in paragraph 1 through 128 inclusive of this Amended Complaint, with the same force and effect as though herein fully set forth herein.

129.    Plaintiff AL-HAIDERI was 54 years old at the time she stopped working due to her disability. Plaintiff was older than her peers who were promoted to Associate Professor.

130.    Upon information and belief, Defendants promoted a younger man than Plaintiff to the position of Associate Professor.

131.    Upon information and belief, this young employee did not possess skills or experience which was as great as those possessed by the Plaintiff.

132.    Defendants' treatment of Plaintiff was undeserved, unduly harsh and unfair when compared to the treatment given the other younger employees whose job skills and performance levels are inferior to the Plaintiff's.

133.    Defendants' actions and treatment of Plaintiff were wrongful, abusive and unconscionable and were based in part or whole upon Plaintiff's age.

134.    The discriminatory acts and conduct of the aforesaid Defendants, including but not limited to Defendants' repeated failure to promote Plaintiff, repeated failure to provide equal compensation, condoning harassment, and subjecting Plaintiff to unequal terms and conditions of employment, as alleged above, were acts committed by the Defendants, as part of a single discriminatory policy and

practice, which is ongoing.

135.    Throughout Plaintiff's employment, the institutional Defendants, took actions which further served their discriminatory policy; to wit, of intentionally limiting Plaintiff's career advancement opportunities, based in part on Plaintiff's age. Specifically, in furtherance of said discriminatory practice, Defendants repeatedly refused Plaintiff Dr. Al-Haideri's numerous requests for promotion, advancement and salary increases.

136.    Defendants' discriminatory acts and practices were related events, in that they were part and parcel of the same ongoing discriminatory policy of limiting Plaintiff's economic and advancement opportunities, based in part on her age. The institutional Defendants condoned said discriminatory policy as carried out by Dr. Deckelbaum, Dr. Discoll and Ms. Hansen, and allowed said discrimination to go unremedied for so long as to adapt same as a practice of the institutional Defendants, based in part on Plaintiff's age.

137.    Plaintiff has been irreparably injured by said abusive treatment and has, by this cloud, been prevented from obtaining gainful employment in her field, has lost wages, lost medical insurance, lost life insurance, suffers severe emotional distress, has lost job security and has incurred other injuries.

138.    Defendants violated public policy in discriminating against Plaintiff because of her age.

139.    Plaintiff has been irreparably denied the rights secured by the Age Discrimination in Employment Act.

140.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive. They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff, and without concern for the damage they would cause. Defendants' acts were motivated by a desire to not accommodate Plaintiff's medical needs without regard for Plaintiff's well-being, and were based on a lack of concern and ill will towards plaintiff.

27

141.    As per the decision of the Honorable Laura T. Swain, *Al-Haideri v. The Trustees of Columbia University in the City of New York, et. al.*, 2007 WL 2187102 (S.D.N.Y. 2007), Plaintiff respectfully claims all acts which occurred on or after December 11, 2003 as being actionable under this Cause of Action.

142.    As a result of the acts of Defendants Plaintiff suffered and is entitled to a sum in excess of five million ($5,000,000.00) dollars in compensatory damages, and a sum for punitive damages, as well as costs and attorneys fees.

## AND AS FOR A FOURTH COUNT
### Title VI, 42 U.S.C. Section 2000(d)

143.    Plaintiff hereby repeats and reiterates each of the facts set forth in paragraphs 1 through 138 as if same were more fully set forth here.

144.    The discriminatory acts and conduct of the aforesaid Defendants, including but not limited to Defendants' repeated failure to promote Plaintiff, repeated failure to provide equal compensation, condoning harassment, and subjecting Plaintiff to unequal terms and conditions of employment, as alleged above, were acts committed by the Defendants, as part of a single discriminatory policy and practice, which continued consistently, throughout Plaintiff's employment since January 4, 2004.

145.    The institutional Defendants, took actions which further served their discriminatory policy of intentionally limiting Plaintiff's career advancement opportunities, based on her Iraqi national origin, her age and disability. Specifically, in furtherance of said discriminatory practice, Defendants repeatedly refused Plaintiff Dr. Al-Haideri's numerous requests for promotion, advancement and salary increases.

146.    Plaintiff made said requests for promotion repeatedly and on a continuing basis and further sought salary increases and advancement/promotion continuing until the she stopped working due to her disability. However, without justification, Defendants continually denied Plaintiff said requests

for promotion, while the institutional Defendants took no action to prevent or remedy said discriminatory treatment of Plaintiff.

147.    Defendants' repeated denial of Plaintiff's request for a promotion were related rejections, as they each served the same discriminatory policy of providing Plaintiff with lesser salary, less compensation, less opportunities and less prestige than her non-Iraqi and/or younger colleagues/employees of the institutional Defendants.

148.    Upon information and belief, Plaintiff's similarly situated colleagues received advancement, higher positions, more responsibilities and more money from the Defendants, based on their national origin (non-Iraqi), younger age and non-disabled status.

149.    The above pleaded discriminatory practices, based on Plaintiff's national origin, by Defendants, their agents and employees, violates Title VI of the 1964 Civil Rights Act and 42 U.S.C. §2000 (d).

150.    The acts of Defendants complained of herein were willful, wanton, malicious and oppressive. They acted with callous disregard, recklessness and deliberate indifference toward the rights of the Plaintiff, and without concern for the damage they would cause. Defendants' acts were motivated by a desire to not accommodate Plaintiff's medical needs, without regard for Plaintiff's well-being, and were based on a lack of concern and ill will towards plaintiff.

151.    As a direct result of the aforesaid, Plaintiff, sustained violations of her Civil Rights, economic losses, extreme mental and emotional harm and stress and other injuries not yet fully ascertained.

152.    As per the decision of the Honorable Laura T. Swain, *Al-Haideri v. The Trustees of Columbia University in the City of New York, et. al.*, 2007 WL 2187102 (S.D.N.Y. 2007), Plaintiff respectfully claims all acts which occurred on or after January 4, 2004 as being actionable under this

Cause of Action.

153.    As a result of the acts of Defendants Plaintiff suffered and is entitled to a sum in excess of five million ($5,000,000.00) dollars in compensatory damages, and a sum for punitive damages, as well as costs and attorneys fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

(a)     First Count: in excess of five million dollars ($5,000,000.00) in compensatory damages, punitive damages and attorney's fees;

(b)     Second Count: in excess of five million dollars ($5,000,000.00) in compensatory damages, punitive damages and attorney's fees;

( c )   Third Count: in excess of five million dollars($5,000,000.00) in compensatory damages, punitive damages and attorney's fees;

(d)     Fourth Count: in excess of five million dollars ($5,000,000.00) in compensatory damages, and attorney's fees;

(h)     A Declaratory Judgment that Defendants wilfully violated plaintiff's rights secured by federal and state law as alleged herein;

(i)     Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to appoint plaintiff to the position that Defendants' illegal actions prevented him from securing; to enjoin Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

(j)     Plaintiff's attorneys fees, disbursements and costs; and

(k)     An order granting such other legal and equitable relief as the court deems just and

proper.

## <u>A JURY TRIAL IS HEREBY DEMANDED</u>

Dated:  Hempstead, New York
        August 8, 2007

THE LAW OFFICES OF
FREDERICK K. BREWINGTON

By:

FREDERICK K. BREWINGTON (FB5295)
*Attorneys for Plaintiff*
50 Clinton Street, Suite 501
Hempstead, New York  11550
(516) 489-6959

31

DOCKET NO.:CV-07-106 (LTS)(DCF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

MAYSOON AL-HAIDERI,

Plaintiff,

-against-

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK, COLUMBIA UNIVERSITY
MEDICAL CENTER, COLLEGE OF PHYSICIANS AND
SURGEONS

Defendants.

-------------------------------------------------------X

AMENDED COMPLAINT

-------------------------------------------------------X

LAW OFFICES OF
FREDERICK K. BREWINGTON
50 Clinton Street, Suite 501
Hempstead, New York 11550
(516) 489-6959